**RUNWAY 27 COALITION, INC., et al., Plaintiffs,**

v.

**Donald D. ENGEN, as Administrator of the Federal Aviation Administration, and Federal Aviation Administration, Defendants.**

Civ. A. No. 82–2528–K.

United States District Court, D. Massachusetts.

June 30, 1987.

Judgment July 30, 1987.

John Marshall, Gail Pennington, Homans, Hamilton, Dahmen & Marshall, Boston, Mass., for plaintiffs.

Frederick Dashiell, Asst. U.S. Atty., Boston, Mass., for Engen and FAA.

KEETON, District Judge.

This action is before the court after completion of non-jury "trial." Supplemental Briefs have been submitted with leave of court.

Plaintiffs claim that defendants instituted certain changes at Logan Airport, Boston, without complying with statutory and

regulatory requirements for consideration of environmental impacts. Specifically, plaintiffs challenge defendants' introduction of a multiple runway configuration for arrivals and departures from runways 27 and 33L at Logan Airport ("Runway 27" and "Runway 33L") in 1973, and a number of changes to the Runway 27 departure headings and procedures, implemented beginning in 1974.

The Plaintiffs' Proposed Judgment (Docket No. 90), submitted at the court's request as a means of clarifying the claims and issues in dispute, would order (1) that the defendant Federal Aviation Administration ("FAA") and its Administrator, defendant Donald D. Engen, prepare an environmental impact statement ("EIS") on the impact of the adoption and use of departure tracks and procedures applicable to flights departing from Runway 27; (2) that, in preparing the EIS, defendants take steps including consultation with representatives of plaintiffs at all stages of the process and as early as possible during the process; and (3) that the court retain jurisdiction to hear forthwith any claim by any plaintiff that the EIS so produced is not in conformity with the court's judgment.

In the alternative, plaintiffs propose a judgment requiring that defendants prepare an environmental assessment ("EA") within a specified time period to determine whether an EIS or a finding of no substantial impact ("FONSI") is required, that the court retain jurisdiction, that if the EA results in the preparation of a FONSI, the FONSI shall not be issued until thirty days after a public hearing, and that if the EA results in preparation of an EIS, additional specified conditions be imposed by the judgment.

Plaintiffs seek relief pursuant to provisions of the National Environmental Policy Act ("NEPA") of 1969, 42 U.S.C. §§ 4321, *et seq.*, and the Federal Aviation Act of 1958, 49 U.S.C. §§ 1301, *et seq.*, and amendments to those acts.

### I.

Before granting the principal relief sought by plaintiffs—an order that defendants prepare an EIS—I must first determine an issue that may in some sense be jurisdictional and is in any event a prerequisite to ordering preparation of an EIS. Is this court authorized, either by Act of Congress or by virtue of some other source of authority, to make findings as to the factual premises essential to ordering an EIS, or is this court's authority limited to judicial review of agency action in regard to making or failing to make findings that determine whether an EIS is or is not required in the circumstances of the dispute over Runway 27 flight patterns, procedures, and practices?

To put the question another way: Is this court to engage in de novo fact finding on the basis of evidence adduced at "trial" in this court? Or is this court instead limited to engaging in judicial review of agency fact finding and decisionmaking (even though with the benefit, as both plaintiffs and defendants agree, of a "record" of agency action or inaction that includes not only contemporaneous documentation by the agency but also the explanation and supplementation provided by evidence produced at this "trial")? Is this court's power limited to remanding to the agency to require appropriate agency action if the agency has made clearly erroneous fact findings or has abused its discretion or committed errors of law either in acting improperly or failing to act properly in response to demands for preparation of an EIS? Though framed as several questions here, this inquiry presents in essence a single basic question about this court's proper function in this case.

In order to sharpen the focus on this basic question, I consider first the statutory and regulatory criteria bearing upon whether an EIS is required.

The legislative source of the EIS requirement is in 42 U.S.C. § 4332, which in relevant part provides:

> The Congress authorizes and directs that, to the fullest extent possible: ... .(2) all agencies of the Federal Government shall—
>
> (A) utilize a systematic, interdisciplinary approach which will insure the

integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

.    .    .    .    .

(C) include in every recommendation or report on proposals for legislation and *other major Federal actions significantly affecting the quality of the human environment,* a detailed statement by the responsible official on—

(i) The environmental impact of the proposed action,

.    .    .    .    .

(E) study ... appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

.    .    .    .    .

*Id.* (emphasis added).

This statute plainly places on the defendants in this case responsibility for determining whether their actions in relation to Runway 27 flight patterns, practices, and procedures constitute "major Federal actions significantly affecting the quality of the human environment." If defendants had so determined, they would have been required by the statute to prepare an EIS. Defendants having not made such a determination, these questions arise: May this court make a determination as to whether the agency actions challenged here constitute "major Federal actions" and, if so, order the agency to prepare an EIS? Or instead is this court limited to reviewing the agency action (and inaction) to determine whether it was arbitrary, capricious, based on clearly erroneous findings of fact, or otherwise contrary to law, and, if so, to order that the agency comply with its obligation to determine by appropriate proceedings whether an EIS should be prepared?

Before answering these questions, as I must in order to decide this case, I take note of an additional question presented if this court lacks authority to order an EIS or, having authority, decides that it should not be exercised in this case: Even if this court cannot properly order that an EIS be prepared, may it and should it order the defendants to prepare (upon a record adequate to permit reasoned judicial review) an EA determining whether, under the statutory standards expressed in 42 U.S.C. § 4332 and elsewhere in NEPA, and in regulations and precedents implementing NEPA, an EIS must be prepared?

## II.

■■■■■ As noted at the outset, plaintiffs propose in the alternative a judgment ordering that defendants prepare an EA.

### A.

The source of the EA requirement is not found in NEPA itself, but in regulations and orders of the FAA and the Council on Environmental Quality ("CEQ").

The FAA issued extensive regulations implementing NEPA in June 1973, the year in which the first actions challenged by the plaintiffs were taken. *See* FAA Order 1050.1A (cancelled June 16, 1977) (Plaintiff's Ex. 26). Although this Order did not use the term "environmental assessment," it did require "environmental consideration" of certain government actions, a requirement that evolved into the EA through superseding FAA Orders. In addition, this Order introduced a structural analysis of categorizing actions which was used in all superseding Orders. The Order created three categories of federal actions: actions ordinarily requiring an EIS, actions not ordinarily causing significant environmental impact and therefore not ordinarily requiring either an EIS or a negative declaration ("ND"), and actions requiring either an EIS or an ND. The ND, which evolved into the FONSI through superseding Orders, was defined as "a written assertion, together with supporting evidence and reasoning as necessary, that the environmental consequences of a proposed action have been reasonably assessed and judged not to significantly affect the quality of the human environment." *Id.* at ch. 1, para. 2(f). Actions falling within the third category, which included all proposed actions other

than those which were categorically included—that is, ordinarily requiring an EIS—or categorically excluded—that is, not ordinarily requiring either an EIS or an ND—required "environmental consideration." *Id.* at ch. 2, para. 14. The Order defined "environmental consideration" to be the "evaluation of a proposed action with respect to agency environmental guidelines and procedures, leading to a formal determination of whether a negative declaration or environmental impact statement is required and, if so, a specific determination of when it is to be prepared." *Id.* at ch. 1, para. 2(d). Thus, under this Order, when considering any action which was neither categorically included nor categorically excluded, the FAA was required to make a formal determination of whether an EIS or an ND was necessary.

FAA Order 1050.1A included in its examples of actions which were categorically excluded:

> Procedural or airspace actions which do not cause traffic to be routed over, or in such proximity as to create substantial environmental impact to schools, hospitals, open-air assemblies, established wildlife sanctuaries and residential districts. Under most circumstances, en route airway and airspace actions can be regarded as not having substantial or significant environmental impact.

*Id.* at ch. 2, para. 15(c)(6). As examples of the actions which required environmental consideration, the order included:

> Arrival and departure procedures and associated airspace actions for operations at less than 3000 feet above the surface where such operations will create significant environmental impact to schools, hospitals, open-air assemblies and residential districts.

*Id.* at ch. 2, para. 14(c)(1).

FAA Order 1050.1A was cancelled and superseded by Order 1050.1B, 42 Fed.Reg. 32631 (1977) (cancelled Dec. 20, 1979) (Plaintiff's Ex. 27), in June 1977. The new Order maintained the structure of categorical inclusion and categorical exclusion. Actions which were "excepted"—or categorically excluded—from the Order and actions which were categorically included were listed in appendices applicable to various types of FAA activities. The appendices relevant to this case concerned air traffic procedures and flight standards. Among the categorically excluded actions relevant to air traffic procedures were:

> preferential departure and arrival routes which do not cause traffic to be routinely routed over noise sensitive areas which may include residential neighborhoods, education, health, religious sites and structures, cultural, historical and outdoor recreational areas or those at or above 3,000 feet above the surface.

FAA Order 1050.1B at Appendix 3, para. 5(f). Among the categorically excluded actions relevant to flight standards were:

> Instrument Approach Procedures, Departure Procedures, and En Route Procedures conducted at 3,000 feet or more above the surface; instrument procedures conducted below 3,000 feet above the surface which do not cause traffic to be routinely routed over noise sensitive areas; modifications to currently approved instrument procedures conducted below 3,000 feet above the surface that do not significantly increase noise over noise sensitive areas; and increases to minimum altitudes and landing minima. Noise sensitive areas may include residential neighborhoods; educational, health, and religious sites; and cultural, historical and outdoor recreational areas. A significant increase in noise is based on a reduction of distance between aircraft and noise sensitive areas of more than 20 percent[.]

*Id.* at Appendix 4, para. 5(j).

The Order introduced the EA, which was required for all actions not categorically excluded:

> ENVIRONMENTAL ASSESSMENT. Prior to undertaking an action which has not been excepted by this order, all relevant environmental factors shall be assessed.... If it is concluded that the proposed action is a major Federal action significantly affecting the quality of the human environment, the responsible official shall prepare and file an EIS. If it is

concluded that the action is not a major Federal action significantly affecting the quality of the human environment, the responsible official shall prepare and file an ND.

*Id.* at ch. 3, para. 300.

Included in the list of air traffic actions "subject to environmental assessment and preparation of an EIS or ND" were:

New or revised ... preferential ... departure and arrival procedures (other than [Instrument Approach Procedures]) for that part of the operations conducted at less than 3,000 feet above the surface where such operations are routinely routed over noise sensitive areas....

*Id.* at Appendix 3, para. 4(a). With respect to flight standards, EA's were required for:

New Instrument Approach Procedures, Departure Procedures, En Route Procedures and modification to currently approved instrument procedures, which are conducted below 3,000 feet above the surface and which will tend to significantly increase noise over noise sensitive areas. This requires consideration of those operations that will be routinely routed over noise sensitive areas....

*Id.* at Appendix 4, para. 4(g).

FAA Order 1050.1B was cancelled and superseded in December 1979 by FAA Order 1050.1C, 45 Fed.Reg. 2244 (1980) (cancelled December 21, 1983) (Plaintiff's Ex. 28). This new Order was issued in response to regulations for implementing the procedural provisions of NEPA issued by the CEQ and codified at 40 C.F.R. Parts 1500–1508. *See* FAA Order 1050.1C at ch. 1, para. 4. The CEQ regulations defined an EA as follows:

"Environmental Assessment":

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with [NEPA] when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by sec. 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9 (1978).

Under the CEQ regulations, agencies are required to prepare an EA "when necessary under the procedures adopted by individual agencies to supplement these regulations." 40 C.F.R. § 1501.3 (1978). In addition, the CEQ regulations required an agency to prepare an EA if the proposed action was neither categorically included nor categorically excluded:

In determining whether to prepare an environmental impact statement the Federal agency shall:

(a) Determine under its procedures supplementing these regulations ... whether the proposal is one which:

(1) Normally requires an environmental impact statement, or

(2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment.... The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required....

40 C.F.R. § 1501.4 (1978).

FAA Order 1050.1C retained the format of previous FAA orders, but adopted some changes to conform to the CEQ regulations. The superseding Order required an EA to be performed before "undertaking an action which has not been categorically excluded by this order." FAA Order 1050.-1C at ch. 3, para. 300. The EA was to lead to the preparation and filing of either an EIS or a FONSI, which replaced the ND. *See id.* at ch. 1, para. 5(g). Referring to the CEQ regulations, the Order stated that the EA was to be:

a concise document ... [which] require[d] only enough analysis ... for the following purposes:

a. To understand the problem and identify reasonable alternative solutions, including the proposed action.

b. To determine whether any potential impacts are significant, which would trigger the environmental impact statement process.

c. To provide the basis for the FAA's finding of no significant impact if the proposed action has no significant impacts.

d. To identify and satisfy special purpose Federal laws, regulations, and executive orders.

e. To identify and satisfy state and local laws and regulations applicable to the proposal.

f. In completing the above, to indicate agencies consulted (and to identify cooperating agencies for environmental impact statement preparation purposes).

*Id.* at ch. 3, para. 300. The Order included as air traffic actions subject to environmental assessment and preparation of an EIS or FONSI, "[n]ew or revised air traffic control procedures which routinely route air traffic over noise sensitive areas at less than 3,000 feet above the surface." *Id.* at Appendix 3, para. 4(a). The categorical inclusions and exclusions with respect to aviation standards and procedures remained the same as those with respect to flight standards in FAA Order 1050.1B quoted above, except that an increase in noise over noise sensitive areas was no longer required to be "significant" to mandate the preparation of an EA. *Id.* at Appendix 4, para. 4(g) and 5(j).

In December 1983, FAA Order 1050.1C was cancelled and superseded by FAA Order 1050.1D, 49 Fed.Reg. 28501 (1984) (Plaintiff's Ex. 29), which remains in effect. The current Order adopts the CEQ regulations' definition of an EA, *see* FAA Order 1050.1D, at ch. 1, para. 5(c) (quoting 40 C.F.R. § 1508.9), and requires that an EA be prepared "[i]f a decision has not been made to prepare an EIS and a proposed action has not been classified as a categori-

cal exclusion." *Id.* at ch. 3, para. 35. In its appendix concerning air traffic, the Order again includes as actions subject to EAs, "[n]ew or revised air traffic control procedures which routinely route air traffic over noise sensitive areas at less than 3,000 feet ABOVE GROUND LEVEL," *id.* at Appendix 3, para. 3(a), and categorically excludes, "[n]ew procedures that routinely route aircraft over non-noise sensitive areas." *Id.* at Appendix 3, para. 4(h). The categorical inclusions relevant to aviation standards and procedures are the same as those in FAA Order 1050.1C, that is, EAs are required for "[n]ew Instrument Approach Procedures, Departure Procedures, En Route Procedures and Modification to currently approved instrument procedures which are conducted below 3,000 feet ABOVE GROUND LEVEL and which will tend to increase noise over noise sensitive areas." *Id.* at Appendix 4, para. 3(g). The categorical exclusions relevant to aviation standards are the same as those in FAA Order 1050.1C. *Id.* at Appendix 4, para. 4(k).

Thus, throughout the time period in which defendants' actions are challenged, FAA regulations required the agency, when considering actions which were not categorically excluded, to formally evaluate environmental factors, through either environmental consideration or an EA, to determine whether an EIS was required or whether an ND or FONSI should be filed.

**B.**

The "record" before me is devoid of any evidence that defendants performed an EA or "environmental consideration" before any of its actions that authorized or acquiesced in the challenged changes in rules and procedures for Runway 27 departures. Because, as explained in Part IIA above, an EA or environmental consideration was required for all actions which were not categorically excluded, in order for the lack of the EA or environmental consideration to be in compliance with the applicable regulations, those changes must have been categorically excluded by the orders.

During the relevant time period, FAA Orders categorically excluded:

(1) procedural or airspace actions which do not cause traffic to be routed over, or in such proximity as to create substantial environmental impact to noise sensitive areas;

(2) departure routes which do not cause traffic to be routinely routed over noise sensitive areas;

(3) departure and en route procedures conducted at 3,000 feet or more above the surface;

(4) instrument procedures conducted below 3,000 feet above the surface which do not cause traffic to be routinely routed over noise sensitive areas;

(5) modifications to currently approved instrument procedures conducted below 3,000 feet above the surface which do not either tend to or significantly increase noise over noise sensitive areas;

(6) increases to minimum altitudes and landing minima.

FAA Order 1050.1A at ch. 2, para. 15(c)(6); FAA Order 1050.1B at Appendix 3, para. 5(f) and Appendix 4, para. 5(j); FAA Order 1050.1C at Appendix 4, para. 5(j); FAA Order 1050.1D at Appendix 4(h) and Appendix 4, para. 4(k).

Throughout the same period, environmental consideration or an EA was required for new or revised departure routes or procedures for operations conducted at less than 3,000 feet above the surface where such operations are routinely routed over noise sensitive areas and either tend to or significantly increase noise over such areas. FAA Order 1050.1A at ch. 2, para. 14(c)(1); FAA Order 1050.1B at Appendix 3, para. 4(a) and Appendix 4, para. 4(g); FAA Order 1050.1C at Appendix 3, para. 4(a) and Appendix 4, para. 4(g); FAA Order 1050.1D at Appendix 3, para. 3(a) and Appendix 4, para. 3(g). Although the precise formulation has varied, at all times the Orders required either an EA or environmental consideration for "[n]ew or revised air traffic control procedures which routinely route air traffic over noise sensitive areas at less than 3,000 feet ABOVE GROUND LEVEL," FAA Order 1050.1D at Appendix 3, para. 3(a), and for new or modified instrument, departure, and en route procedures "which are conducted below 3,000 feet ABOVE GROUND LEVEL and which will tend to increase noise over noise sensitive areas." *Id.* at Appendix 4, para. 3(g).

I conclude on the "record" before me in this case that the agency refusal to prepare an EA in this case was erroneous as a matter of law. The record on which the agency acted in deciding not to prepare an EA would not support a finding of fact that the challenged changes in rules and practices for Runway 27 departures were not "[n]ew or revised air traffic control procedures which routinely route air traffic over noise sensitive areas at less than 3,000 feet ABOVE GROUND LEVEL," FAA Order 1050.1D at Appendix 3, para. 3(a), or were not "[n]ew Instrument Approach Procedures, Departure Procedures, En Route Procedures [or] Modification to currently approved instrument procedures which are conducted below 3,000 feet ABOVE GROUND LEVEL and which will tend to increase noise over noise sensitive areas." *Id.* at Appendix 4, para. 3(g).

Plaintiffs challenge two types of actions with respect to Runway 27. First, they argue that the introduction of a multiple runway configuration for arrivals and departures on Runways 27 and 33L in 1973 significantly increased the number of departures from Runway 27 and the amount of noise over the communities under the Runway 27 flight track. Second, plaintiffs challenge a number of changes made to the Runway 27 departure headings and procedures. The parties agree that the changes were made, but disagree as to their effect. Before June 1974, an aircraft departing Runway 27 turned from the runway heading of 270° to 260° as soon as it stabilized and then maintained an initial heading of 260° until reaching an altitude of 1,200 feet, at which point it was turned on course. In June 1974, the initial heading was changed to 255°, and the aircraft was still vectored on course at 1,200 feet. During October 1975, the FAA implemented a test procedure in which the initial heading

remained at 255°, but the point at which the aircraft was vectored on course was changed to either 3,000 feet or 4DME. (4DME represents a distance of approximately four nautical miles from the Logan Airport Very High Frequency Omni Range Station ("VOR"). DME refers to distance measuring equipment which is housed at the VOR station, approximately one mile east of the west end of Runway 27.) The October 1975 test lasted until March 1976, when the departure procedure was permanently implemented. Between February 1977 and March 1978, the FAA implemented Runway 27 departure procedure tests in which an aircraft used (1) an initial heading of 260° and no change of heading; (2) an initial heading of 270° with a change to 255° at 2DME (located at the Boston Fish Pier, approximately one nautical mile from the west end of Runway 27 on the opposite side of the Boston inner harbor); (3) an initial heading of 270° with a change to 245° at 2DME. In all three test procedures, an aircraft was vectored on course at either 4DME or 3,000 feet. In April 1978, the second test procedure (270° initial heading, change to 255° at 2DME, vector on course at 4DME or 3,000 feet) was implemented. In June 1978, the change in heading at the 2DME point was changed from 255° to 250°. In May 1980, the option of vectoring on course at the 4DME point was eliminated and the aircraft was required to turn on course at 3,000 feet.

It is clear that these changes—all of which entailed changes in direction before vectoring on course at either 3,000 feet or 4DME—affected flight paths less than 3,000 feet above ground level. Thus, in order to justify the lack of an EA (for those changes implemented after June 16, 1977, the effective date of FAA Order 1050.1B) or environmental consideration (for changes implemented before June 1977, which were controlled by FAA Order 1050.-1A), the record on which the agency acted must be sufficient to support a finding that the changes to flight paths under 3,000 feet did not "routinely route air traffic over noise sensitive areas" or "tend to [significantly] increase noise over noise sensitive areas."

The evidence is clear, however, that the changes in flight procedures altered the flight paths over residential areas. For example, defendants' witness, Gary Tucker, testified that an aircraft departing Runway 27 would reach an altitude of 3,000 feet anywhere from approximately four to eight miles from the airport. Tr. Vol. 2 (February 12, 1987) at 71. As his further testimony and marks on an aeronautical chart indicate, the average point at which the 3,000 foot level would be reached, approximately seven nautical miles from the airport, and the paths leading to that point, are all located directly above residential areas. *Id.* at 77 and Defendants' Ex. FF. Thus, it is clear that the changes in the departure procedures affected flight paths over residential areas at a level less than 3,000 feet.

## C.

Defendants argue, however, that the changes in the departure procedures did not route aircraft over any "new" noise sensitive areas because the surface area over which aircraft now travel is generally the same as had been affected by the previous procedures. Defendants rely on Mr. Tucker's testimony concerning the flight tracks under the 1974 procedures (initial heading 260°, vector on course at 1,200 feet) and those under current procedures (initial heading 270°, change to 250° at 2DME, vector on course at 3,000 feet).

As Mr. Tucker explained the original procedures, an aircraft would depart at the runway heading of 270° and turn to the initial heading of 260° once it stabilized, which would occur anywhere between the end of the runway and one mile away, on the average somewhere over the inner channel of the Boston Harbor. Tr. Vol. 2, at 78. Once turned, aircraft would remain at a 260° heading until reaching a level of 1,200 feet, which would occur anywhere from three to eight miles west of the airport. *Id.* at 85. Sometimes an aircraft would be forced to maintain the 260° heading well beyond the 1,200 foot level before turning, in order to resolve potential conflicts with smaller aircraft to the north, *id.*

at 85–86, although the controller would attempt to turn the aircraft as quickly as possible after it reached 1,200 feet. *Id.* at 84. When reaching an appropriate turning level (of at least 1,200 feet), the controller had the option of turning the aircraft anywhere in a range between 250° and 290°, although 70% of the aircraft would head west at 250–270°. *Id.* at 83–84.

The flight tracks that would result from following this procedure would cover a fan-shaped area, narrow near the airport where all aircraft turn to the initial heading of 260° once stabilized and then widening as the aircraft attempt to follow a 260° heading, and finally fanning out as the aircraft reach 1,200 feet anywhere from three to eight miles from the airport and then turn on course to headings between 250° and 290°. The actual flight tracks within this fan-shaped area would vary because of the significant variation in the flight paths of aircraft following identical departures procedures due to differences in winds, weight, temperature, and type of aircraft. *Id.* at 69–70; 79–82. Thus, the flight tracks of different aircraft following the same procedures would not fall on a straight line representing the magnetic headings they follow but would instead scatter near that line. *See* Plaintiffs' Exh. 31 (computer diagram of flight tracks from 13 aircraft departing from Runway 27 on May 23, 1979).

Under the current procedures, an aircraft maintains the runway heading of 270° until reaching 2DME, at approximately the east end of the Boston Fish Pier, and then turns to 250°. *Id.* at 78. The turn from 270° to 250° takes between one-quarter of a mile and one mile to complete, with the average point being somewhere over the Fort Point Channel area of Boston. *Id.* at 79. The aircraft then maintains the 250° heading until being vectored on course upon reaching 3,000 feet, although, as explained above, the actual flight tracks will vary. *Id.* at 81–82. Mr. Tucker testified that all of the flight tracks produced by aircraft following these current procedures would lie over areas that had already been affected by aircraft flying under 3,000 feet under the original procedures. *Id.* at 86.

Despite the variations in the flight paths of aircraft following identical departure procedures, it is clear that a change in headings will cause a different distribution of the flight paths. This finding is amply supported by the evidence in the record concerning the variations in flight tracks of aircraft following identical headings and the distances between the flight tracks of aircraft that follow different headings. For example, at the point seven nautical miles from the end of the runway, which Mr. Tucker identified as the average point at which aircraft would reach the 3,000 foot level, there is a distance of approximately three-quarters of a statute mile between the line representing the flight track of a plane which turned precisely at the 2DME fix to a 250° heading and that of a plane which turned precisely to a 255° heading. *Id.* at 76–77. Of course, the distance between these flight tracks would be even greater at a further distance from the airport, at the extreme end of the range of distances at which aircraft reach the 3,000 foot level. Although the actual flight tracks will not follow these precise lines, the patterns of the flight tracks produced by aircraft following the different headings will not be identical. The computer chart of thirteen flight tracks from Runway 27 departures which turned to 250° at the 2DME point, which Mr. Tucker used to show the variations in flight paths of aircraft following the current procedures, shows a distance of slightly less than one mile between the most extreme northern track and the most extreme southern track. *See* Plaintiffs' Ex. 31. Even assuming that the distance between the most extreme flight tracks may increase at the point seven nautical miles from the airport (a point not included on the computer chart) at which the average aircraft reaches 3,000 feet, and at which the distance between the lines representing the 250° and 255° headings is three-quarters of a mile, the record could not support a finding that the flight tracks produced by aircraft following those two headings would be identical. Instead, it is clear that the areas under the flight tracks would overlap, with some northern

segments of the total area under the combined flight tracks being affected only by the 255° flight tracks, and some southern segments of the total area being affected only by the 250° flight tracks. Thus, the changes in departure headings caused a redistribution of flight tracks among the areas that had previously been affected by Runway 27 departures.

### D.

In light of this evidence, defendants argue that even though changes may have caused new patterns of distribution of the flights over particular segments of this fan-shaped area affected by the original procedures, the impact on the environment of the new distribution of flights is not significantly different from the impact of the old distribution, because *no new area* is affected.

Necessarily implicit in this argument is the unexpressed premise that a significantly different impact on the individuals living in different segments of this fan-shaped area is wholly irrelevant. Thus, this defense contention depends on the premise that NEPA permits an agency an entirely unfettered discretion to make a decision that—as expressed in John Rawls, *A Theory of Justice* (1971)—serves "the calculus of social interests" or "the welfare of society as a whole" even if it substantially intrudes upon "the liberties of equal citizenship" by imposing substantially greater hardships on identifiable individuals without compensating them in any way. *Cf. id.*, 3, 4, 27–28. Such a preference for social calculus over individual entitlement is an assumed choice, in this context, of one in preference to another of two conflicting principles that pervasively influence the legal system but rarely produce a result, such as defendants propose here, of complete rejection of one to serve the other, rather than some form of accommodation between the two. *Cf.* R. Keeton, *Entitlement and Obligation*, 46 U.Cin.L.Rev. 1, 10–13, 39–43 (1977).

For this defense contention to be sustained here, it must appear that, in NEPA, either Congress has mandated such an unqualified preference for community interest over individual interest, or at least that Congress has left federal agencies to make such a choice, in their unfettered discretion, in the application of NEPA to specific environmental impact disputes. Careful scrutiny of the language of NEPA discloses no support for either the claim of mandate or the claim of such unfettered discretion. For example, among the stated objectives of the Act is to:

> attain the widest range of beneficial uses of the environment *without degradation, risk to health or safety, or other undesirable and unintended consequences....*

42 U.S.C. § 4331(b)(3) (emphasis added). Even more cogent as an expression of concern for individual rights rather than merely the good of the whole community is the objective of the Act to achieve a balance:

> between population and resource use which will permit high standards of living and a *wide sharing of life's amenities....*

42 U.S.C. § 4331(b)(5) (emphasis added). Unmistakably clear is the declaration that:

> *each person* should enjoy a healthful environment....

42 U.S.C. § 4331(c). Both separately, and when read in the context of the entire Act, these provisions express a mandate of individual entitlement to protection against degradation of the environment by unreasonable agency action. *Cf. City of Irving, Texas v. FAA*, 539 F.Supp. 17, 29 (N.D.Tex. 1981) (upholding FONSI for 60–day test of change in runway departure procedures but requiring EIS for its permanent implementation; "mere fact that the ... aircraft noise is being moved from one area to another" does not change conclusion that permanent implementation would have "a significant effect on 'the quality of the human environment'").

Defendants therefore cannot support their contention that the changes in departure procedures did not routinely affect new noise sensitive areas at levels below 3,000 feet.

### E.

Defendants contend that the increase in the number of departures from Runway 27 does not correlate with the introduction of the multiple runway configuration for arrivals and departures from Runways 27 and 33L, but was instead due to the generic growth of aircraft operations at Logan Airport and the concomitant demand for departure operations placed on the FAA air traffic control system. Defendants further contend that the introduction of the multiple runway configuration constitutes a "routine operational adjustment to the demand for aircraft arrival and departure operations placed on the air traffic control system" and was "not an agency action." Defendants' Supplemental Post–Trial Brief (Docket No. 99) at 13. Defendants have made similar arguments with respect to the departure procedures challenged by plaintiffs.

The first problem with these contentions is that the record before me discloses no finding by the agency in support of the position the agency now asserts in this court. I conclude that I cannot sustain the defense contention that agency action is to be upheld as long as the evidence in the record would have been sufficient to sustain such a finding. Judicial review of agency action is, in this respect, unlike judicial consideration of a constitutional challenge to a statute. No comparable presumption of validity applies. Judicial review of agency action is review upon a "record," even if the record, as in this case, does not consist solely of contemporaneous documentation. No agency fact findings are to be presumed on matters as to which an agency fact finding is essential to validity of the action and as to which the record provides no basis for a determination or review that such a finding was in fact made, at least implicitly if not explicitly. Rather, in such circumstances a court must set aside the agency action and remand for the agency to reconsider and to make essential fact findings explicit enough that the court can determine whether the agency has engaged in reasoned and supportable rather than arbitrary and capricious decisionmaking.

Moreover, I conclude that the record before me would not support a finding, even if one were assumed to have been made implicitly by defendants, that these changes did not constitute "new or revised ... preferential departure and arrival procedures." FAA Order 1050.1B, at Appendix 3, para. 4(a).

A second problem with these contentions involves defendants' assumptions about causation. In essence, this is an argument that agency action is not a legally recognized cause of the harm plaintiffs have suffered and will suffer in the absence of legal relief. If interpreted as a "sole cause" or "intervening cause" defense, it fails because the intervening developments to which defendants point as causes of the harms at issue were foreseeable. The agency actions taken in advance of these intervening developments are legal causes because the harms are foreseeable consequences of foreseeable growth in airport use and foreseeable actions of others in response to that growth. *Cf. Springer v. Seaman*, 821 F.2d 871, 876–77 (1st Cir. 1987) (discussion of legal cause); *Virginians for Dulles v. Volpe*, 541 F.2d 442 (4th Cir.1976) (FAA's acquiescence in vastly expanded growth of airports required preparation of an EIS, even if changes in environmental impacts originated with airlines and passengers; NEPA requires agencies to address environmental consequences not only when considering future projects but also when reviewing present policies and programs, at least when expanding or revising them). Especially in this context of foreseeability of the consequences of earlier agency action, the continuing agency inaction when these previously foreseeable developments occur in fact is likewise a legal cause of the ensuing harm. Every human event has many causes in fact, and the legal system seldom determines that one alone among the antecedents of an event is *the* legal cause. Rather, the earlier agency action is *a* legal cause because of the foreseeability of the consequences, and the later agency inaction is also *a* legal cause of the same consequences. Even if no "significant" harm to the environment

occurred before intervening growth, the agency is nevertheless legally responsible for the foreseeable consequences of its action. In this respect, this defense argument in the present case is analogous to the argument of one among multiple contributors to increased pollution that his conduct is legally protected because his conduct is no different from what it had been before increased numbers of polluters and increased discharges of pollutants by each eventually reached the point of causing significant harm. Expressing essentially the same point in another familiar imagery, the fact that some other person adds the straw that breaks the camel's back is not a defense for all the preceding contributors to the excessive load.

### F.

Defendants next argue that even if the agency action in this instance was not within categorical exclusions, it was nevertheless also not among the categorical inclusions, and that the agency made an implicit, if not explicit, determination, that the agency action was not a "major Federal action significantly affecting the quality of the human environment" and that this determination was not arbitrary, capricious, based on clearly erroneous findings of fact, or otherwise contrary to law.

In significant part, the defense argument is founded on the premise that the agency was free, in its discretion, to authorize Runway 27 departure practices that imposed on individual plaintiffs significant harmful effects from noise of aircraft below 3,000 feet passing above their residences as long as the agency reasonably found that no feasible alternative procedures and practices for departures from Runway 27 would produce less overall harm to the whole community served by Logan Airport.

One problem with this contention is that the agency did not make any explicit finding of this kind. For the reasons stated in Part IIE above, I conclude that agency action cannot be supported by a contention that the record would have supported a particular finding when the record also discloses no basis for inferring that such a finding was in fact made.

A second problem with the defense contention that significant harm may be imposed upon particular individuals as long as the overall community interest is not disserved is even more fundamental, and must be rejected for the reasons stated in Part IID above.

Plaintiffs, if not entitled to greater relief, are entitled to an order requiring that defendants prepare an EA forthwith.

### III.

■ Are the plaintiffs entitled at this time to an order granting any relief beyond that stated in Part II of this Opinion? Specifically, should this court order the preparation of an EIS rather than an EA?

Plaintiffs contend that if the FAA had properly considered or assessed the environmental effects of the Runway 27 changes, "it would have been difficult to reach any conclusion other than that these changes would be likely to have a significant effect on the human environment" and that "any finding other than one that resulted in the preparation of an EIS would have been unreasonable, arbitrary and capricious." Plaintiffs' Trial Brief (Docket No. 89) at 33. Plaintiffs therefore request that the court, on the basis of the administrative record as supplemented at "trial," order that an EIS be prepared.

The First Circuit has stated the standard of review of an agency's decision not to prepare an EIS as follows:

[O]ne challenging a decision *not* to prepare an EIS must show a "substantial possibility that agency action 'could significantly affect the quality of the human environment.'" If the record reveals such a "substantial possibility" with sufficient clarity, the agency's decision (not *to produce an EIS) violates* NEPA. Depending upon the agency's reasons, a reviewing court might say that such an agency made a mistake interpreting NEPA or the CEQ regulations, or the court might say that the agency's "no significant impact" finding was simply

"arbitrary, capricious, an abuse of discretion," 5 U.S.C. § 706(2)(A). Often these questions cannot be easily separated one from the other. But whatever verbal formulation it applies, the court in a case like this must essentially look to see if the agency decision, in the context of the record, is too "unreasonable" (given its statutory and factual context) for the law to permit it to stand.

*Sierra Club v. Marsh*, 769 F.2d 868, 870 (1st Cir.1985) (citations omitted). When a reviewing court concludes that the agency's decision not to prepare an EIS was "too unreasonable to stand," it can order an EIS to be prepared. *Id.* at 882. In *Marsh*, the court ordered the preparation of an EIS on the basis of its review of the agency's decision, made after preparation of an EA, to file a FONSI rather than an EIS. In this case, however, there is no administrative record of an EA and FONSI to form the basis of judicial review. Thus, I must consider whether the *Marsh* standard of "too unreasonable to stand" should be applied in circumstances in which the administrative record of the agency's decision not to prepare an EIS is virtually nonexistent.

■ In *Citizen Advocates for Responsible Expansion, Inc. v. Dole*, 770 F.2d 423 (5th Cir.1985), the court considered a challenge to an agency's decision not to prepare an EIS in circumstances in which the agency had "completely failed to shoulder [its] burden of developing an adequate and reviewable administrative record." *Id.* at 434–35. In *Citizen Advocates*, the agency had prepared draft and final ND's for a highway expansion project, but the court of appeals concluded that the ND's had failed to consider the impact of one part of the project, which had been added to that project after the draft ND had already been prepared. The court concluded, however, that the inadequacy of the administrative record with respect to this part of the project did not preclude its review of the agency decision to prepare an ND. Instead, the court held that "[i]n the interest of administrative and judicial economy we nevertheless possess discretion as a reviewing court to determine whether an EIS was required based upon both the administrative record and the later-developed evidence that was prepared for and presented at the trial." *Id.* at 437. The court proceeded to review the combined administrative and trial record and concluded that the decision not to prepare an EIS was unreasonable under the applicable regulations. Although *Citizen Advocates* is not wholly analogous to this case, because the court did have an EA and ND to review even though it concluded that they did not provide an adequate administrative record, the decision nevertheless gives some support to plaintiffs' argument that this court has the power to order the preparation of an EIS notwithstanding the lack of an EA and ND or FONSI to review.

I conclude, however, that I should not order an EIS on the basis of the "record" now before me, because I do not conclude that the sole reasonable finding to be made on the basis of this record is that an EA would necessarily lead to a determination that the changes in Runway 27 procedures were major federal actions which significantly affected the human environment. Because the current record was largely developed at trial rather than by the agency, the agency has not had an opportunity to assess the Runway 27 changes in light of either the record developed at trial or the conclusions stated in this Opinion. An EA prepared in light of this record and Opinion will produce an administrative record for review which is different from the record currently before the court. Under the current CEQ regulations, in preparing an EA, the agency "shall involve environmental agencies, applicants, and the public, to the extent practicable." 40 C.F.R. § 1501.4(b) (1986). The EA must include "brief discussions of the need for the proposal, of alternatives ..., of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9 (1986). Even if the agency does not create additional evidence beyond what is contained in the supplemented "record," its consideration and assessment of the changes in Runway 27 may lead to reasonable findings which would be different from those this court might make. Be-

cause the court's role is to review the agency's decision under a standard of whether it is too unreasonable to stand rather than to make its own findings de novo, I conclude that this matter should be remanded to the FAA for preparation of an EA and such further agency action, if any, as may be required by reason of the findings and conclusions reached in the EA.

Although concluding that an EA rather than an EIS should be prepared, I nevertheless share the concerns for judicial and administrative economy expressed by the court in *Citizen Advocates.* I will therefore order counsel to confer with each other to attempt to reach agreement on a proposed form of judgment. Either a single agreed-upon proposal or, if the parties do not reach an agreement, the proposals of plaintiffs and defendants should be filed with the court no less than two days before a conference to be held on Thurs., July 30, 1987 at 3:30 p.m. I will also order that the EA be prepared within 180 days of the date of the conference, and will retain jurisdiction over the case in order to ensure prompt judicial review should the EA lead to the filing of a FONSI.

## JUDGMENT

The above action having been heard by the court and a decision having been rendered in the Opinion of June 30, 1987, and further hearing having been held on July 30, 1987 as to the form of judgment, it is ORDERED:

Plaintiff shall have judgment against defendants as follows:

1. The Federal Aviation Administration and T. Allan McArtor, as he is Administrator of the Federal Aviation Administration, shall prepare an environmental assessment ("EA") which complies with all applicable requirements of law, both procedural and substantive, including the National Environmental Policy Act of 1969 (42 U.S.C. §§ 4321 et seq.), FAA Order 1050.ID and CEQ Regulations (40 CFR §§ 1500 et seq.), on the impact on the human environment of:

   a. the introduction of a multiple runway configuration procedure for arrivals and departures from runways 27 and 33L at Logan Airport in 1973, and

   b. the changes to the Runway 27 departure headings and procedures implemented beginning in 1974 and culminating in the current departure headings and procedures for Runway 27 in place at Logan Airport.

2. The EA shall be performed expeditiously and the EA process, including the decision either to issue a finding of no significant impact ("FONSI") or to prepare an environmental impact statement ("EIS"), shall be completed no later than February 26, 1988. A copy of the EA shall be provided to plaintiffs, to their counsel and to other interested parties.

3. The evidence presented at the trial of this action and the Opinion of this court dated June 30, 1987 shall be considered part of the administrative record for the EA.

The court retains jurisdiction of the case in order to facilitate prompt judicial review (a) if defendants fail to comply with this judgment and (b) if the EA leads to filing of a FONSI.

Costs are awarded to plaintiffs.