**CHARTER TOWNSHIP OF HURON, MICHIGAN (92–1717/3276); City of Dearborn, Michigan (92–3535), Petitioners,**

v.

**Thomas C. RICHARDS, Administrator of the Federal Aviation Administration, et al., Respondents.**

Nos. 92–1717, 92–3276, 92–3535

United States Court of Appeals, Sixth Circuit.

Argued April 26, 1993.

Decided July 8, 1993.

James E. Baiers, Richard C. Marsh (argued and briefed), Clark, Klein & Beaumont, Detroit, MI, for plaintiff-appellant.

Mary S. Rigdon, Asst. U.S. Atty., Detroit, MI, for defendants-appellees.

J.E. Murdock, III, Federal Aviation Admin., Office of Gen. Counsel, Peter R. Steenland, U.S. Dept. of Justice, Land & Natural Resources Div., Katherine L. Adams (argued and briefed), Environment & Natural Resources, Washington, DC, for respondents.

David J. Hensler (argued and briefed), George U. Carneal, A. Lee Bentley, III, Hogan & Hartson, Washington, DC, for petitioners.

Before: KEITH and SUHRHEINRICH, Circuit Judges; and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

Two residential suburbs of Detroit seek review of an action of the Federal Aviation Administration (FAA) redistributing landing and take-off patterns at Detroit Metropolitan Wayne County Airport (Detroit Metro). Designed to improve air safety and efficiency as well as to help solve traffic conflicts from nearby satellite airports, the "procedures and airspace delegation in the [Detroit Metro] airspace" were implemented on November 16, 1989.

In challenging the FAA's action, the petitioners contend that the agency failed to comply with requirements of the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (1988) (NEPA), and the Administrative Procedure Act, 5 U.S.C. § 551, et seq. (1988) (APA) and failed to follow its own regulations in promulgating the changes. Both petitioners ask this court to declare the FAA action invalid and to enjoin further implementation of the November 1989 air traffic control procedures. In their briefs the petitioners also seek a mandatory injunction requiring the FAA to return to the air traffic control procedures in place prior to November 1989.

With agreement of the parties, these cases were consolidated for oral argument and decision. For the reasons that follow, we dismiss the petitions for review and deny the prayers for injunctive relief.

I.

The FAA conducted studies prior to implementation of the procedures and airspace delegation in question, and issued an information bulletin on October 6, 1989, entitled "Environment Impact of Detroit Airspace Renovation." The bulletin stated, in part:

In preparation for implementation, the facility has reviewed aircraft routing at all altitudes under the proposed plan and compared them to existing flows. Through this action they have determined that the majority of arrival and departure routes will remain as they are today. Of the few route changes required, the facility has determined that they are over rural, non-noise sensitive areas and that aircraft will overfly them at or above 5,000 feet MSL.

Both petitioners dispute the FAA's assertion that the new procedures and allocation of traffic did not alter the pre-existing jet departure area, but only slightly reallocated jet traffic within that area. They also disagree with the agency's characterization of the changes as being mostly high altitude changes.

A.

The petitioner City of Dearborn is situated north of Detroit Metro. Before the changes there were only two seldom used departure tracks that were routed over Dearborn, and an average of about three jets per day departed directly over the city. Under this pre-November 1989 allocation, most of the traffic taking off to the northeast departed along Interstate–94. Dearborn states that the November 1989 changes created several new departure tracks, eliminated others, and rerouted a substantial majority of all northbound departure traffic. These changes had a dramatic impact on Dearborn. Basically, the I–94 corridor traffic was transferred to tracks over Dearborn. This resulted in an average of ninety jets a day departing over Dearborn. Dearborn also maintains that the changes allowed the planes to seek higher altitude more rapidly, which exacerbated the noise problem as well. The FAA states that a residual effect of the changes has been a significant net decrease in the number of individuals throughout the entire area subjected to noise greater than 65 DNL (Day–Night Average Annual Sound Level).[1]

After receiving noise complaints, the FAA began exploring options that would abate the noise. In April 1990, the FAA agreed to implement "preferential south flow." Since the population is more sparse to the south, the FAA agreed to depart from the customary practice of having the aircraft take off and land into the face of the prevailing wind. Instead, under preferential south flow, the aircraft land and depart to the southwest as long as the tail wind does not exceed 7 knots. Dearborn maintains that even with this preference there are 15 times as many daily jet departures over Dearborn as there were prior to implementation of the November 1989 changes.

The petitioner Huron Township lies south of Detroit Metro. Huron states that the November 1989 changes resulted in *all* southerly jet departures being directed over the western half of Huron Township. Prior to the November 1989 changes, there were eight southerly departure tracks from Runways 21 R/C/L with no distinction as to whether these tracks could be used by jet and/or prop traffic. Six of these departure flight tracks departed over Huron. The November 1989 changes resulted in nine new departure tracks from Runways 21 R/C/L. Five of these tracks are for jets and each of these is directed over the Township. These are the only southerly departure tracks for jets. Additionally, when the south flow preference was implemented, the number of departures dramatically increased over Huron. After implementation of the 1989 procedures and the 1990 south flow preference, the jet

1. This is the measurement used by the FAA to establish a method of correlating exposure to sound to human response and annoyance level. The FAA has established by rule that 65 DNL is the level below which aircraft noise is compatible with all land uses for federal purposes, including residential, recreational, public, commercial and manufacturing uses. 14 C.F.R. A150.101(d) (1992). Conversely, 65 DNL or greater is considered significant aircraft noise. Prior to the implementation of the new procedures, 37,510 people in the Detroit area were affected by significant aircraft noise and by 1990 this number had been reduced to 14,870.

departures over Huron increased from 25.2% to 71.9% of all Detroit Metro jet departures. In addition to the resulting increase in noise, Huron also claims that as a result of both these changes its Township has suffered an impairment of water and air quality. The FAA contends that between 1988 and 1990 the number of Huron Township residents subject to significant aircraft noise increased only from 1,780 to 1,920.

### B.

After the 1989 changes and the preferential south flow were implemented, the FAA created a Technical Working Group to examine a full range of options to reduce aircraft noise. The group reviewed many options including returning to the pre-November 1989 system. After rejecting the possibility of returning to the pre-November 1989 system because of safety concerns, the group narrowed the options to the following alternatives: (1) enhancing the south flow at any time the winds from the north were less than 10 knots; (2) opposite direction nighttime operations when feasible; and (3) retaining the north and south flow departures in a more equitable dispersal area. The FAA decided to conduct a six-month test of these options. Shortly after the test began the tail wind component was lowered back to 7 knots. Prior to the test, the FAA completed an Environmental Assessment (EA) and issued a Finding of No Significant Impact (FONSI) for the proposed test.

After the 180–day test, Wayne County requested the FAA to implement the proposed changes. FAA then began consideration of whether to make the changes. It prepared a Draft Environmental Impact Statement in April 1992. The FAA invited comment and then issued a Final Environmental Impact Statement in September 1992 (1992 Final EIS). This Final EIS discussed a wide range of options but ultimately recommended that the FAA adopt the proposals of the Technical Working Group, with some minor

changes. The FAA explains that after these procedures are put in place there will be further reduction in the number of individuals impacted by significant noise.

On November 16, 1992 the FAA issued its Record of Decision (ROD) adopting the recommendations contained in the 1992 Final EIS. The ROD noted the existence of the present challenges and stated that it was intended to "moot all contentions raised in those actions."

### C.

On March 18, 1992, Huron Township brought an action against the FAA in federal district court. On March 20, 1992, Huron filed its petition for review in this court as a "protective pleading" for limitation period purposes. Huron asserted in the district court proceeding that there was no issued and entered FAA order reviewable in the courts of appeals under 49 U.S.C.App. § 1486(a) (1988), the statutory basis for original jurisdiction in this court. The district court dismissed Huron's lawsuit on June 5, 1992 for lack of jurisdiction.[2]

The petition for review alleges that in implementing the 1989 air traffic changes and the 1990 south flow preference, the Administrator of the FAA violated NEPA as well as the APA. Huron states that both the 1989 procedures and the 1990 south flow preference had substantial adverse environmental impact and the FAA conducted absolutely no environmental analysis and provided no public notice regarding the implementation of these changes, despite the fact that they were major in scope and created a public furor due to the resulting noise intrusion. It asks that this court enjoin the changes and return the airport to its pre-November 1989 flight tracks.

The City of Dearborn filed an original petition for review in this court challenging the 1989 changes on June 5, 1992. Dearborn

---

**2.** In its Reply Brief, Huron states that it is withdrawing its "Motion in Case No. 92–3276 that jurisdiction is properly before the District Court and its related appeal of the District Court Dismissal Order in Case No. 92–1717 .... and Huron Township believes that it [the administrative record] is more than adequate for this Court to render a decision on the merits." Counsel for Huron at oral argument confirmed that Huron has withdrawn its appeal as well as any contention that this court does not have jurisdiction.

also seeks an injunction to force the FAA to stop following its November 1989 Order that implemented air traffic changes at Detroit Metro and presents arguments similar to those of Huron. Dearborn, however, challenges only the 1989 changes.

## II.

■ The FAA filed motions to dismiss both petitions for review as untimely. Section 1006(a) of the Federal Aviation Act, 49 U.S.C.App. § 1486(a) (1988), provides that an "order" of the FAA "shall be subject to review by the courts of appeals of the United States . . . upon petition, filed within sixty days after the entry of such order, by any persons disclosing a substantial interest in such order. After the expiration of said sixty days a petition may be filed only by leave of court upon a showing of reasonable grounds for failing to file the petition theretofore."

The petitions were clearly filed out of time, but the petitioners argue that the FAA engaged in "misconduct" and "stonewalled" their requests for information about the November 1989 changes. Dearborn cites efforts by its counsel to obtain information, including requests under the Freedom of Information Act. The FAA responds that it furnished the requested information by sending Dearborn a copy of the final order of February 25, 1990, including Appendix 14, which detailed departure headings from Detroit Metro under the November 1989 procedures. Dearborn insists that the 60–day limitations period was tolled until May 29, 1992, when it received a copy of the 118–page order of November 1989. The FAA responds that the information in Appendix 14 to the February 25 document contained the same description of departures headings as the November order.

The FAA argues that even though Dearborn may not have had constructive notice by publication of the November 1989 order, it clearly had actual notice of the changes in departure headings. It was complaints from Dearborn residents that caused the FAA to order a noise abatement study. Further, the Dearborn City Council adopted resolutions in March and July 1990, urging the FAA to return to the pre-November 1989 air traffic

control procedures at Detroit Metro. In addition a meeting was held on March 30, 1990, with the Mayor of Dearborn, the County Commissioner of Dearborn and two concerned residents at which the noise problems resulting from the new departure headings were discussed. It is clear that Dearborn understood the effect of the November 1989 order far in excess of sixty days before it filed its petition for review. The city appears to argue, however, that it had no duty to seek review until the FAA provided the 118–page order itself, either by publication in the Federal Register or by delivery pursuant to Dearborn's requests.

Huron makes similar arguments, contending that it had no adequate notice of the November 1989 order and that the FAA's "secretive conduct" deprived the township of information it required in determining how to proceed.

■ We do not believe that either petitioner has made out a case for equitable tolling of the sixty day filing requirement. Nevertheless, while we do not accept the claim that the FAA was guilty of "misconduct" or "secretive conduct," we do believe the petitioners have presented reasonable grounds for permitting the late filings under the previously quoted escape provision of 49 U.S.C.App. § 1486(a). There is evidence that the FAA created confusion with respect to the scope of the changes in departure headings and the manner in which they were put in place. The petitioners made reasonable efforts to obtain the information they felt necessary in order to proceed, but the FAA was not very forthcoming. We agree with the court in *Greater Orlando Aviation Authority v. F.A.A.*, 939 F.2d 954, 960 (11th Cir.1991), that such confusion presents reasonable grounds to explain delay in filing a petition for review. The Court of Appeals for the District of Columbia has stated in regard to time limits on judicial review of agency action that "the calendar does not run until the agency has decided a question in a manner that reasonably puts aggrieved parties on notice of the rule's content." *National Air Transportation Ass'n v. McArtor*, 866 F.2d 483, 485 (1989) (quoting *RCA Global Communications, Inc. v. FCC*, 758 F.2d 722,

730 (D.C.Cir.1985). While we are dealing here with an order rather than a rule, we think the same requirement should apply.

## III.

■ The principal contention of both petitioners is that the FAA failed to comply with NEPA's requirements in implementing the November 1989 changes in air traffic control at Detroit Metro. Huron claims a similar failure in implementation of the south flow preference.

### A.

The petitioners argue that the FAA was required to prepare an environmental assessment (EA) before implementing the November 1989 changes. NEPA does not contain such a requirement, but the FAA has issued extensive regulations implementing NEPA. One rule requires the FAA to prepare an EA for "[n]ew or revised air traffic control procedures which routinely route air traffic over noise sensitive areas at less than 3,000 feet ABOVE GROUND LEVEL." FAA Order 1050.1D at app. 3, para. 3(a). Both petitioners assert that the new procedures had an adverse impact on their communities by, in fact, greatly increasing the jet traffic below 3,000 feet now routed over their residential areas.

The FAA did not prepare an EA before implementing the November 1989 procedures. However, the agency did not proceed without any consideration of the environmental impact of the changes. After reciting its review of the impact of the proposed changes the FAA made the following findings in the previously cited October 6, 1989 information bulletin:

a. New routes will routinely route aircraft over non-noise sensitive area and are, therefore, categorically excluded.[3]

b. Aircraft operating on existing routes will be at or above the altitudes they are today and, therefore, not subject to an environmental assessment.

3. The FAA regulations contain a list of categorically excluded actions. If an action satisfies a

These findings are consistent with the conclusions contained in a previous Information Memorandum of September 28, 1989, entitled "Environmental Study of the New Airspace and Procedures for Detroit Metro." That memorandum stated the purposes of the changes:

Detroit Metro is changing inbound and outbound routes for all IFR aircraft operating under our jurisdiction. Some routes have moved several miles, others have remained almost unchanged. The purpose of this change was to improve services to the user, reduce frequency and airspace congestion, improve safety, decrease individual controller workload by resectorizing airspace, and decrease noise by keeping arriving jets higher and allowing departing jets to climb to higher initial altitudes.

After discussing the changes, the memorandum concluded:

We feel that our new airspace configuration and procedures will decrease noise overall, decrease frequency/airspace congestion, and improve safety.

### B.

The Supreme Court discussed NEPA in *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989), and defined its purpose and plan for achieving that purpose as follows:

Section 101 of NEPA declares a broad national commitment to protecting and promoting environmental quality. 83 Stat. 852, 42 U.S.C. § 4331. To ensure that this commitment is "infused into the ongoing programs and actions of the Federal Government, the act also establishes some important 'action-forcing' procedures."

*Id.* at 348, 109 S.Ct. at 1844–45 (citations omitted).

The sweeping policy goals announced in § 101 of NEPA are thus realized through a set of "action-forcing" procedures that require that agencies take a " 'hard look' at environmental consequences," *Kleppe* [*v. Sierra Club* ], 427 U.S. [390], at 410, n. 21

categorical exclusion no EA is required.

[96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976) ] (citation omitted), and that provide for broad dissemination of relevant environmental information. Although these procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.

*Id.* at 350, 109 S.Ct. at 1846 (citations omitted).

■ An EA is not a definitive document for purposes of compliance with NEPA. Rather, it is a first step, which results in a decision with regard to the next step. Upon completion of an EA, the FAA must either order the preparation of an Environmental Impact Statement (EIS) or a Finding of No Significant Impact (FONSI). Thus, the purpose of an EA, which is defined in regulations of the Council on Environmental Quality (CEQ) as a concise document describing the environmental impacts of proposed actions and alternatives, 40 C.F.R. § 1508.9 (1992), is to provide the agency with the basic information needed to decide on the next step.

The FAA argues, and we agree, that the issuance of a final EIS in September 1992, followed by the 1992 Record of Decision for the Permanent Implementation of Air Traffic Control Noise Abatement Procedures at Detroit Metro (1992 ROD), renders the present petitions moot. These two documents, extending to 360 pages, contain a comprehensive study of the noise problems around Detroit Metro. The 1992 Final EIS states that its purpose "is to respond to the impacts of the November, 1989 air traffic changes and all subsequent changes in Air Traffic Control procedures." The EIS discusses various alternative procedures, including returning to the pre–1989 procedures.

Dearborn and Huron argue that the 1992 Final EIS and ROD do not address their complaints. These documents, they say, are premised entirely on the assumption that the 1989 and 1990 changes will remain in effect and they deal with a much broader noise abatement problem than those that concern the petitioners. Dearborn and Huron assert that these documents do not serve the same purpose that preparation of an EA before implementation of the November 1989 procedures would have served. The petitioners contend that the FAA is required, even after all the work that went into the 1992 Final EIS and ROD, to conduct a separate EA confined to the effect of the 1989 changes alone. We disagree.

It is clear that the 1992 Final EIS was produced as a direct result of the 1989 changes and the complaints that those changes engendered. The EIS contains an entire chapter on alternatives discussed by the Technical Working Group to reduce noise that resulted from the 1989 changes. The group considered returning to the pre-November 1989 procedures, but rejected this alternative because it would adversely affect safety, increase airspace congestion, increase controller workload, and increase the noise impact in the total Detroit Metro area.

An Appendix to the 1992 Final EIS contains the FAA's response to public comments that preceded its issuance. With respect to comments suggesting a return to pre-November 1989 procedures, the response states:

In November of 1989, a series of Air Traffic Control procedures were implemented to enhance safety, reduce airspace congestion, and decrease individual controller workload. The new procedures reduced required coordination between controllers, simplified the handling of air traffic and redistributed airspace to reflect controller workload and traffic complexity. It also segregated the slower propeller traffic from the faster jet traffic.

Prior to November, 1989 the Detroit Metro Air Traffic Control Tower experienced a gradual . . . . [increase in the] number of aircraft. . . . This activity increased the level and complexity of traffic at the Airport to such a degree that the old procedures were not sufficient either in terms of safety or efficiency. This evolution in airspace use resulted in a need to modernize the airspace.

### C.

This court has stated that "[m]ootness results when events occur during the pendency of a litigation which render the court unable to grant the requested relief." *Carras v. Williams,* 807 F.2d 1286, 1289 (6th Cir.1986) (citations omitted). While this court may have the power to order the FAA to prepare an EA with respect to the November 1989 changes, it would be foolish to do so. It is not as if the FAA has ignored the concerns of the petitioners. It has undertaken a comprehensive study in response to those concerns. *Cf. State of Wisconsin v. Weinberger,* 745 F.2d 412, 424 (7th Cir.1984). We will not order a party to do that which it has already done. Even though the FAA's conclusion that the 1989 changes came within a categorical exclusion to the EA requirement may have been erroneous, see *Runway 27 Coalition, Inc. v. Engen,* 679 F.Supp. 95 (D.Mass. 1987), the agency has now done all that the regulations would require if a 1989 EA had indicated the need for an EIS. Our review of the 1992 Final EIS and ROD convinces us that the FAA has given full consideration to the environmental impact of the 1989 flight pattern changes in the context of attempting to alleviate noise problems in the Detroit Metro area.

The documents in the extensive administrative record show that the FAA was concerned with the environmental consequences of the 1989 order. The agency changed the flight patterns over Dearborn, and immediately felt the "heat" from its officials and residents. It attempted to lessen the impact on Dearborn by adopting the preferential south flow, and this produced complaints from Huron. Caught in this squeeze, the agency ordered a comprehensive review and study of noise problems and considered a number of alternatives, including returning to the pre-November 1989 procedures. All of this is documented in the 1992 Final EIS and ROD. Nothing would be gained by ordering an EA.

■ Finally, both petitioners request an injunction that would require the FAA to return to the pre-November 1989 procedures, apparently as punishment for its failure to prepare an EA prior to implementing the changes at that time. The issuance of an injunction is within the court's equitable discretion. Before resorting to this extraordinary remedy, a court must balance the interests of the parties giving particular attention to the public consequences of a decree. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). To require the FAA to return to the pre-November 1989 landing and take-off procedures at Detroit Metro after all the study and concern reflected by the record would clearly be against the public interest.

The purpose of NEPA and the CEQ regulations is to require agencies, prior to undertaking a major federal action, to take a "hard look" at the environmental consequences of the proposed action. *Methow Valley Citizens Council,* 490 U.S. at 350, 109 S.Ct. at 1845. The FAA has done that now, in far greater detail than the "concise statement" required in an EA. If the petitioners are convinced that the 1992 Final EIS and ROD are flawed, their recourse is to seek review of those documents, not to insist on the utterly futile act of prohibiting use of the present flight patterns and ordering a return to the pre-November 1989 procedures. For this purpose, we hold that the time for seeking review of the 1992 Final EIS and ROD is tolled pending our final disposition of this consolidated appeal. The petitioners will have sixty days in which to seek such review from the entry of our mandate in this case.

### IV.

We discuss briefly two additional arguments of the petitioners.

### A.

■ Both petitioners also contend that the FAA violated the notice and hearing requirements of the APA in implementing the November 1989 procedures. We disagree. The procedures for allocating airspace were contained in an order issued pursuant to 49 U.S.C.App. § 1485(a) (1988). In issuing this order the FAA was not exercising its rulemaking power, to which the notice and comment provisions of the APA apply. See 5 U.S.C. §§ 553(b) and (c). The petitioners'

reliance on *San Diego Air Sports Center, Inc. v. F.A.A.*, 887 F.2d 966 (9th Cir.1989), and *Southern California Aerial Advertisers' Ass'n v. F.A.A.*, 881 F.2d 672 (9th Cir.1989), is misplaced. In both cases the FAA attempted to fix rights of members of the general public with respect to use of navigable airspace. Such actions are rulemaking, subject to the APA's notice and comment requirements. They fall within the rubric of "legislative," rather than "interpretative" rules, a distinction that this and other courts have defined. See *Friedrich v. Secretary of HHS*, 894 F.2d 829, 834 (6th Cir.), *cert. denied*, 498 U.S. 817, 111 S.Ct. 59, 112 L.Ed.2d 34 (1990), *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). These definitions make clear that the November 1989 order is an interpretative rule. The APA specifically excepts such rules from the notice and comment requirements. 5 U.S.C. § 553(b)(A).

### B.

■ Huron also contends that the FAA violated its own regulations by implementing the November 1989 procedures without prior publication in the Federal Register, citing 14 C.F.R. Subpart D (1992). We believe a careful reading of the regulations demonstrates that such publication is required only if the action is taken under the rulemaking process. If the agency correctly determines that the action is not subject to rulemaking requirements, Subpart D's directions do not apply. Furthermore, as with the NEPA arguments, we believe the actions taken by the FAA render any controversy about compliance with agency regulations moot.

The petitions for review are dismissed and the prayers for injunction are denied.